[No. 1935.]

*Ex Parte* THOMAS W. COCHRAN.

MURDER — HABEAS CORPUS — FACT CASE.— See the statement of the case for evidence in a *habeas corpus* proceeding for bail, under a charge of murder, *held* insufficient to authorize a remand without the privilege of bail; and note the opinion for an award of bail in the sum of $2,500.

*Habeas Corpus* on appeal from the District Court of Johnson. Tried below before the Hon. J. M. Hall.

The applicant in this case was committed to the custody of the sheriff of Johnson county, Texas, without bail, by a *mittimus* issued on the 2d day of January, 1886, by S. H. Brown, justice of the peace of precinct No. 1 of Somervell county, Texas, there being no safe jail in the said county. The charge upon which the applicant was committed was the murder of John B. McLennan, in Glen Rose, Somervell county, Texas, on the 25th day of December, 1885. On the 7th day of January, 1886, applicant sued out a writ of *habeas corpus* before the Hon. J. M. Hall, judge of the eighteenth judicial district, who was then holding the term of the district court of said Johnson county. The writ was made returnable on the 14th day of January, 1886. Upon the hearing, which adjourned on the 15th day

of January, 1886, the applicant was remanded without bail. From the order refusing bail this appeal is prosecuted.

Byrd Humphreys was the first witness introduced by the applicant. He testified that he entered McLanahan's saloon in Glen Rose, Texas, with the applicant, on Christmas day, 1885, a few minutes before the killing of McLennan by the applicant. They passed through the saloon and out at the back door, returning presently through the same door. As they entered the saloon the last time, applicant threw his hat on the billiard table at which deceased and W. R. Stroop were playing billiards. The hat fell to the floor on the opposite side of the table, from which it was taken up by Stroop, who handed it back to applicant with the request not to throw it on the table again. Applicant replied that he would not throw it on the table again, and that in doing it the one time he meant no harm at all, and was purely in fun. Stroop remarked, "that is all right." About this time the deceased, McLennan, walked around the table to where applicant was standing, and told him not to throw his hat on the table again. Applicant replied that he meant no harm in doing what he did; that when he threw the hat he thought both parties playing were friends of his; that he hoped he would be excused, and that, if he had interfered with the game, he ought to pay, and was willing to pay, the table fees, and proposed to do so, producing money and proposing to treat. Deceased then said: "I don't want your whisky." Applicant then asked him his name. He replied that his name was "Jones." Applicant responded "All right; I like the Jones family, so let's drop this and take a drink." About this time Stroop remarked, "No, his name is McLennan." Deceased said: "Yes, by G—d, my name is John B. McLennan; and I want you to understand that I am not afraid of you." He at the same time tapped applicant on the breast with his left hand. Applicant said again that he meant no harm by tossing his hat on the table; that he did it in fun, and was willing to do anything right to settle the matter, and again proposed to pay the table fees and treat. Deceased reiterated that he did not want applicant's whisky; advanced upon, and struck applicant in the breast with the back of his hand, and said: "I want you to understand that I am not afraid of you." Applicant said: "My friend, I want you to keep your hands off of me. I have proposed everything that is fair, and you must keep your hands off of me." At about this juncture Mr. McLanahan and J. R. Wilson got between the parties and told deceased to stand back. Deceased changed his billiard cue from his left to his right hand, and put his left hand into

his pocket, but drew no weapon that the witness saw. He then pushed Wilson aside, caught his cue in both hands, drew it into a striking position, said: "G—d d—n you, I will fix you, and——". when applicant fired three shots and fled through the front door of the saloon. Witness did not know the weight or size of the billiard cue deceased had, but thought that, in the hands of a man of his physical strength, it was a deadly weapon. Deceased would weigh about one hundred and sixty-five pounds, and was at least thirty pounds heavier than the applicant. During the difficulty, deceased advanced upon applicant at least fifteen feet, backing him to a row of whisky barrels beyond which he could not go. Some twenty-five or thirty men were in the saloon at the time of the difficulty. Witness stood within three or four feet of the parties from the inception of the difficulty until the shooting began. When the shooting was over witness followed applicant out of the saloon to Campbell's livery-stable. At the stable applicant called for his horse, when witness told him that his saddle horse was gone. Applicant had a couple of buggy horses in the stable, one of which he ungeared and was in the act of placing on it the bridle, when the sheriff stepped up and arrested him. Witness did not attempt to aid the escape of applicant while at the livery-stable. He could easily have done so, as he had a horse, saddled, standing behind the stable.

Cross-examined, the witness said that he and applicant, though friends, were not special or intimate friends. Witness did not help applicant ungear the buggy horse. Witness thought that, perhaps, he did tell Campbell to let applicant have a horse. Witness heard the explosion of a fire-cracker or pistol, as he and applicant walked towards McLanahan's saloon. He did not hear or see the applicant discharge his pistol, nor see a pistol in his hands, nor did he know that applicant had a pistol until the difficulty occurred. Witness did not undertake to say that deceased made any effort to strike the applicant with the cue. He had the cue in a striking attitude, the large end over his shoulder, and was trying to get at the applicant when the latter fired. The cue was about five feet in length, and when deceased grasped it with both hands he advanced on the applicant.

J. R. Wilson was the next witness for the applicant. He testified that he was in McLanahan's saloon and heard and saw the difficulty which culminated in the killing of deceased by the applicant. When the row commenced the witness was standing at the lunch counter endeavoring to quiet another difficulty then in progress between other parties. The talk between applicant and deceased attracted witness's attention, and he walked across the saloon towards the

parties. The witness heard applicant say to deceased that he, applicant, threw his hat on the billiard table in fun, meant no harm, and would pay the table fees and treat the crowd. Applicant then produced some money and said: "Let's all of us go up and take a drink to settle this thing. This is Christmas, and I came in here to treat the crowd." Deceased replied that he did not want any of applicant's whisky. Applicant then asked deceased his name. Deceased replied that his name was "Jones." Applicant said: "Well, I know the Jones family and like them. Let's settle this thing by taking a drink." Stroop said: "Tom, his name is McLennan." Deceased remarked: "Yes, by G—d, my name is John B. McLennan. I have heard of you before, and I want you to understand that I am not afraid of you." With this remark deceased advanced on applicant, holding his cue with the large end up, and tapped applicant on the breast with his right hand. At this juncture witness caught deceased and tried to push him back. Deceased, however, pressed the witness back against the billiard table, tearing his vest. Witness recovered himself, and again got between deceased and applicant, and about that time McLanahan got between them, facing witness, and took hold of both of them. Meantime applicant had backed to a stack of whisky barrels, near the wall. Deceased then took his cue in his right hand, big end up, thrust his left into his pocket, stepped towards applicant, reached over McLanahan, and tapped applicant on the breast again, and again remarked that he wanted applicant to understand that he was not afraid of him, and that he, applicant, "could not run a blind calf over him." Applicant again protested that he had thrown the hat on the table in fun, meant no harm, and was willing to pay the table fees and treat the crowd. Deceased again tapped applicant on the breast, repeating that he was not afraid of him. Applicant replied: "I don't want you to be afraid of me, but you must keep your hands off of me, if you please." Deceased then grasped the cue, big end up, in both hands, advanced and said: "D—n you, I will fix you," or "D—n you, I will see you." Three or four shots were instantly fired in rapid succession by the applicant. Deceased stepped back around the corner of the billiard table, sank to the floor, and died within fifteen minutes. When applicant came into the saloon and threw his hat on the billiard table he said: "Hold up, boys!" Witness, while attempting to pacify deceased, heard Stroop tell deceased that he knew the applicant and that applicant meant no harm. Deceased paid no attention to Stroop. Witness thought that the ball from the first shot went into the floor, that the second

took effect in deceased's leg, and the third in his breast. The shots were all fired in rapid succession. From first to last the deceased followed the applicant in his retreat some ten or fifteen feet. Throughout, until the shooting, applicant's endeavor seemed to be to adjust the difficulty and appease the deceased. Deceased appeared very angry, and was in weight at least thirty pounds heavier than applicant. The cue which deceased held in his hand was about five feet long and weighed twenty-two ounces, and was such a weapon as, wielded by a man of deceased's strength, would readily burst a man's skull. When applicant fired, he had backed against a stack of whisky barrels, and could retreat no further.

Cross-examined, the witness said that his acquaintance with applicant extended over the last five years. He and applicant had a difficulty sometime previous to this tragedy, but had become reconciled, and were now friends, but could not be called intimates. When he advanced on the applicant, deceased had his cue in a striking attitude, but witness could not say that he made an actual effort to strike with it. He held the cue, big end up, advanced and said, " I will fix you," when the first shot was fired. He could have struck the applicant by taking one more step forward. He might have been able to strike applicant from where he stood if he had had time after securing that position, but the first shot was fired by applicant too soon for him to make the stroke. Just as deceased advanced upon applicant the last time, applicant drew his pistol from under his vest and fired instantly.

S. B. Walker was the next witness for the applicant. He testified substantially as did the witness Wilson, except that, while he heard deceased say something when he advanced on applicant with his uplifted cue, the last time, or just at the time of the shooting, he did not understand his words. Witness could not say that deceased attempted to strike applicant with the cue, but he advanced upon applicant, with his cue in a striking attitude. He was near enough to strike applicant when the first shot was fired, but he did not have time. Witness did not stay to see what occurred after the shooting commenced, but " pulled his freight."

The next witness for the applicant was Mr. J. W. Young. His testimony varies in no material respect from the testimony of Wilson and Walker. Deceased appeared angry from the commencement of his conversation with applicant about the throwing of the hat upon the billiard table, and the applicant persistently apologized in the manner stated by previous witnesses. Deceased advanced upon applicant, with his cue held in a striking attitude, despite the

efforts of McLanahan to impede him, until the applicant, having backed to the whisky barrels, fired. Witness heard Stroop tell the deceased that applicant was a friend of his, and that he meant no harm by throwing his hat upon the billiard table.

L. B. McLanahan was the next witness for the applicant. He testified that he lived in the town of Glen Rose, and was the proprietor of the saloon in which McLennan was killed by the applicant on Christmas day, 1885. Witness did not see the applicant throw his hat upon the billiard table. He was in another part of his establishment at the time, and knew nothing of a disturbance until he saw a crowd gathering about the table. He then went to the point where the crowd was gathered, and saw deceased standing with his billiard cue in his hand, talking to applicant, who was then explaining to deceased that he meant no harm in throwing his hat upon the table. He said: "I thought I knew you both, and did it in fun. I am sorry I did it; I am willing to pay for the game and treat; let's go and take a drink." Witness at this juncture stepped between the parties, placed a hand upon the shoulder of each and said: "Here, boys, quit this." Applicant protested again that he meant no harm in throwing his hat upon the table,— that he thought some of his friends were the parties playing, and did it in fun. Deceased reached across the witness with his hand, slapped applicant on the breast, and replied: "*That* is all right; *that* is all right, but you spoke too abruptly (or too impudently) to me." At that time the deceased had the billiard cue in his hand, holding it with the large end up. Applicant reiterated that he intended no harm, and proposed again to treat. Deceased replied that he wanted none of applicant's whisky, pushed witness a foot towards applicant, advanced, reached across witness and slapped applicant's breast again, and said, with an oath: "I am not afraid of you." Applicant backed to the whisky barrels and replied: "I have told you that I meant no harm by it; I have made every explanation one gentleman can make to another, and now I want you to keep your hands off of me." Deceased pressed witness further back, extended his hand, slapped applicant again, and repeated that he was not afraid of applicant. Witness next felt applicant's right arm move, and in an instant the first shot was fired, and then, after an interval of two seconds, two more shots were fired. Deceased turned, folded his arms and started around the table. Witness met him, and seeing that he was sinking, caught and eased him to the floor, where he died in a few moments, without speaking. Witness could not see deceased's right hand when the first shot was fired, and conse-

quently could not say in what manner he held the cue, or whether or not he made any effort to strike applicant with the cue. Witness stood very nearly between deceased and applicant from the time of deceased's advance upon applicant until the shooting was over. He did not see J. R. Wilson about the parties, but he may have been there. Deceased was too large and strong for witness to prevent his advance by physical force. Applicant retreated as far as he could. The billiard cue was a twenty-two ounce instrument, and in the hands of a strong man like deceased was a deadly weapon. Witness had never seen the deceased until about one hour prior to his' death.

Cross-examined, the witness stated that when he reached the crowd he thought that the misunderstanding was over, as, having heard applicant explain to deceased, he heard deceased say: " *That* is all right, but you spoke too abruptly (or too impudently) to me, but it is all right." The subsequent occurrences were, however, as stated by witness on direct examination. Witness did not see the deceased attempt to strike with the cue at any time, but did not see the cue at all just at the time the first shot was fired. The witness may, on the examining trial, have used language as follows: " Tom Cochran then said: 'Keep your hands off of me.' I turned around and remarked: 'Boys, quit this.' Deceased then reached his left hand across my breast and told Cochran: 'My friend, you .spoke rather abruptly, or rather impudently, but it is all right,' and the third time he did this the shooting commenced." The written instrument containing that statement is signed by the witness's name and hand. It was read over to witness on the examining trial, and witness wrote his signature to it. The statement quoted is substantially but not literally correct. As a matter of fact deceased did not use the expression "my friend," nor did he say "it is all right" three times. The defendant's counsel then read from the witness's testimony before the jury of inquest as follows: "The first thing I heard after this was Cochran begging pardon of the deceased for moving the billiard balls. The deceased stepped up to Cochran, placed his hands upon his breast and remarked: 'You spoke too abruptly to me.' .Cochran then said to the deceased: 'G—d d—n you, keep your hands off of me,' drew his pistol and commenced firing.' The deceased made no attempt to defend himself." Witness replied to the question whether or not he so testified on the coroner's inquest as follows: "That evidence was written down and I signed it, but it was taken about an hour after the killing, when I was excited and everything in confusion, and it is not

correct at all. I had not noticed it before, but I say now that it is not correct. I don't know that my memory is any better now than it was then. My present evidence, and that on the examining trial, is correct, but that on the inquest is not."

Cliff Hardin testified, for the applicant, that he was the constable of the Glen Rose justice's precinct and assisted the sheriff in the arrest of the applicant three or four minutes after the killing. The arrest was made at Campbell's livery-stable, about fifty yards from McLanahan's saloon. Witness was in the saloon at the time of the killing, but did not see the difficulty. He saw the applicant leave the saloon, followed him to the livery-stable, arriving there about the time that the sheriff did, and found applicant bridling a horse. He told applicant that he had killed McLennan. Applicant replied: "Well, I had to do it; I did it in self-defense. If others had done as much as J. R. Wilson did, they would have kept him off of me, and there would have been nothing of it."

E. H. Chandler, sheriff of Somervell county, testified for the applicant that he was with Cliff Hardin when applicant was arrested. When Hardin told applicant that he had killed McLennan, applicant remarked that he was forced to do it; that deceased struck or cut him in the breast, and he was forced to kill him in self-defense, and that if others had done as much to stop deceased as J. R. Wilson did, there would have been nothing of it. The witness picked up applicant's pistol in the stable. It was a self-cocking 38-caliber five-shooter, all chambers empty.

Doctor Milam testified that he and applicant were brothers-in-law. Witness examined the dead body of McLennan. He found two wounds in the body. One struck the leg. The other entered the body at the lower extremity of the breast-bone and passed out of the back. There was no other wound on the body. Applicant owned four horses, two buggies and about $800 in money. His wife owned the homestead of one hundred and sixty acres and about two hundred head of cattle. He could make a bond of perhaps $2,500.

Captain Phar, one of applicant's attorneys, testified as did Doctor Milam as to applicant's financial condition. A bond of $2,500 or $3,000 was the utmost bail applicant could give. The case for the applicant was closed at this point.

Mart Martin was the State's first witness. He testified that he was leaning on the lunch counter in McLanahan's saloon, listening to a dispute between Cliff Hardin and Walter Gardner, when the difficulty in which McLennan was killed commenced. Witness was standing near the artesian well pipe, which, emptying behind the

counter, made considerable noise, interfering considerably with other sounds. Applicant came into the saloon at the back door, threw his hat on the billiard table at which deceased and Bud Stroop were playing. Stroop was the first to speak. He said: "Hold up, Tom! I have got a d—d hard game." Several words which witness could not catch, passed, and Stroop said: "All right, Tom!" About that time deceased, who was on the opposite side of the table, walked to where applicant and Stroop were talking, and remarked: "We have a very tight game." A "jower," the trend of which witness could not hear, ensued between applicant and deceased. McLanahan then interfered and separated the parties, saying something which the witness could not hear. Deceased then patted the applicant on the shoulder and said: "All right; all right!" Applicant then asked the deceased his name. Deceased replied that his name was "McLennan." Applicant said to deceased: "You needn't get your d—d —— (rear private) up!" Deceased replied: "D—n it, I am not afraid of you!" Witness heard him say nothing more. Applicant then put his right hand in his breast, and held it there during the quarrel or "jower." McLanahan got between the parties, who were then standing close together. Deceased made no effort to strike applicant, but after McLanahan got between the two, the deceased patted applicant on the shoulder and said: "All right; all right!" and applicant stepped back, drew his pistol, and commenced shooting. The first shot seemed to pass between deceased's legs, the second, witness thought, struck him about the privates, and he flinched a little, the witness thought, with his left leg; the third shot struck higher up, and at the fourth shot, deceased turned, and applicant fled by the witness and out through the front door of the saloon, with his pistol in his hand. Just after the fourth and last shot was fired, the deceased, at the northeast corner of the billiard table, clinched both arms across his breast, and was in a stooping posture, when the witness left his position, ran to the door and saw applicant going towards Campbell's livery-stable. Just as witness turned back McLanahan caught and eased the deceased to the floor. Death ensued in a few minutes. When first fired upon by the applicant the deceased held his cue in one hand, one end resting on the floor.

This witness was cross-examined, but no variance with his testimony in chief was shown.

R. L. Bailey testified, for the State, that he was present and saw the fatal rencounter between the applicant and the deceased. Applicant came into the saloon and threw his hat on the billiard table.

Witness was then standing near the table. Deceased told applicant not to throw his hat on the table again. Applicant asked if he moved any of the balls. Deceased replied that he did not, and that, if the act was not repeated, it was all right. Something more, which witness did not understand, was then said, and applicant told deceased to hush his mouth. Deceased replied that he did not have to hush his mouth. Deceased then walked towards applicant and a few words, unintelligible to witness, passed, and then deceased laid his hand on applicant and told him not to talk so saucy about the matter. Applicant replied by telling deceased to take his hands away or he would kill him, and fired on deceased. Witness did not see the pistol until the last of the three or four shots were fired. The third shot, the witness thought, struck the deceased in the breast, and if there was a fourth it struck him in the back. At the last shot applicant fled and witness walked up to deceased and eased him to the floor. Deceased had a billiard cue in his hand, large end up, but made no effort to strike with it that witness saw. Deceased and witness were half-brothers.

Cross-examined, the witness said that of the twenty or thirty men in the saloon at the time, some ten or fifteen stood at times between the witness and the disputing parties. Witness could not see the two parties throughout the difficulty, but could and did see the billiard cue towering over the heads of the men. Witness did not hear all that was said, because of the confusion, and did not see all, perhaps, that was done. He saw no effort on the part of deceased to strike applicant.

J. W. Campbell testified, for the State, that he saw the parties in the saloon shortly before the shooting, but, as a row was evidently imminent, witness left. He saw deceased step up to applicant and heard him remark: "I am not a fighting man," but could understand nothing else that was said. Four shots were then fired, but witness did not see either deceased or applicant at that time. He next saw applicant passing Willingham's store with his pistol in his hand. A few minutes later he saw McLennan, dead. He saw the body at the inquest an hour later. Deceased was shot through the leg, through the breast, and once through the back.

Bud Stroop testified, for the State, that while he and deceased were engaged playing billiards in McLanahan's saloon, applicant came in and threw his hat on the table. The hat fell to the floor and witness picked it up and returned it to applicant with the request not to throw it on the table again. Applicant replied that he would not, that he was in fun and meant no harm. Witness then said it

was all right. Deceased then passed around the table and asked applicant not to throw his hat on the table again. Applicant made him the same reply he had just made the witness. Deceased then said: "That is all right, but don't do it again." Applicant then said: "I did not know who were playing, but thought it was some of the boys I knew." Deceased replied: "All right, but don't do it again." Applicant then asked deceased his name. Deceased walked forward, tapped the applicant on the shoulder and said: "My name is McLennan; I am no fighting character, but I am not afraid of you!" The applicant replied: "That is all right, but keep your hands off of me." Deceased then, holding his cue in his right hand, large end up, reached over with his left hand and tapped the applicant on the breast. McLanahan stepped between the parties about this time, and pushed deceased back. Deceased advanced with his cue still in his right hand, reached over McLanahan with his left and tapped applicant again. The applicant then said: "Keep your hands off of me," pulled his pistol and fired three times. The first shot, the witness thought, passed into the floor. He thought that the second took effect in deceased's stomach, and the third in his back. If deceased made any attempt to strike with the cue, witness did not see it. Applicant fired the first shot from under McLanahan's arm.

Cross-examined, the witness said that deceased did not, in answer to applicant's question, say that his name was "Jones." It was witness's recollection that he, witness, told applicant that deceased's name was McLennan, and that deceased then said that his name was John B. McLennan. Applicant several times protested to deceased that he meant no harm, and begged pardon of deceased. Witness told deceased that he knew applicant, that applicant meant no harm, and tried to get the deceased to drop the matter. McLanahan tried to get deceased to drop the matter. Deceased advanced at least eight feet upon applicant, and applicant backed as far as he could get. When shot, deceased was reaching towards applicant with his left hand and holding up his cue in his right. If he said "D——n you, I will fix you," the witness did not hear him. Applicant did not, in witness's hearing, say: "You needn't get your d——d —— up." The witness could not say that deceased was trying to strike applicant when the shooting commenced, but he held his cue in a striking position. The crowd scattered when the shooting commenced.

W. W. Wilshire testified, for the State, that he did not see or hear the first of the fatal difficulty. The witness first heard applicant ask deceased his name. Deceased replied, "Jones," and Stroop

said: "No, Tom, his name is McLennan." Deceased, with an oath, said: "Yes, my name is John B. McLennan." Applicant then asked if he moved any of the balls. Deceased replied in the negative, and applicant replied: "Well, then, if I moved none of the balls, you shut your mouth." Deceased then said: "I am not a brave man, nor much of a fighter, but I am not afraid of you, or your sort." He then moved towards applicant, changing his cue from his left to his right hand, and changing the cue so as to throw the large end up. Witness did not know whether or not deceased laid his hand on applicant, but applicant said: "If you don't keep your hands off of me I will kill you," and presently the firing commenced. McLanahan was nearly between the parties, trying to stop the difficulty. Witness did not see deceased attempt to strike applicant, but he had his cue up and was gesturing with his other hand. After applicant passed out of the saloon he exclaimed: "I am the wildest wolf in the woods."

Cross-examined, the witness said that when deceased last advanced upon applicant, he, witness, who was standing very near to applicant, passed behind, and away from that position, being just able to squeeze through between applicant and the whisky barrels. He left that position because, seeing the deceased gesturing, with his cue up, he was afraid deceased might "peel away" with that cue and, by mistake, smash his, witness's, head. Witness did not see the deceased try to strike with the cue, but the shot was fired so quick that deceased could scarcely have used the cue.

Mart Tigart testified, for the State, that he was standing at the lunch counter in the saloon when applicant walked in and threw his hat on the billiard table. Deceased told him not to do that again. Applicant picked up his hat and said to deceased: "I am not afraid of you, G—d d—n you." Deceased replied: "You have been bulldozing people around here, but you can't run over me." Deceased stepped towards applicant with his cue, large end up, in his hand; stopped and rested his cue on the floor. Other words passed, and applicant pulled his pistol and fired four times. Deceased was doing nothing — was standing still — when shot.

Cross-examined, witness said that he lived in Bosque county, but like any other "fool boy" with the chance, went to Glen Rose to spend his Christmas with his cousin, and " happened " into the saloon in time to see the shooting. He heard and saw what he had testified to, but did not hear all that was said, nor did he see all that occurred.

S. T. Embry testified, for the State, that he heard the applicant,

after he passed out of the saloon, a few moments after the shooting, exclaim, "I am the wildest wolf in the woods."

J. W. Campbell testified, for the State, that he examined the dead body of McLennan, and found three wounds upon it. One was a flesh wound in the leg. Another was a wound in the breast, and the third a wound in the back. The latter, witness thought, entered the body from behind.

Mr. Bailey, deceased's step-father, testified that he saw the body of deceased undressed. The shirt showed two holes near the middle of the back.

The State next introduced in evidence the written testimony of McLanahan, before the coroner's inquest and the examining court, and read from that document the statements corrected and denied by McLanahan on his cross-examination on this trial.

*Poindexter & Padelford* and *W. B. Featherston*, for the applicant.

*J. H. Burts*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE. Appellant, having been committed to custody of the sheriff of Johnson county, by order of an examining court, for the murder of one John McLennan, sued out a writ of *habeas corpus* with a view of getting bail before the Hon. J. M. Hall, judge of the eighteenth judicial district. Upon a full hearing of the testimony adduced, he was refused bail by said district judge and was remanded to custody, and this is the judgment here appealed from. As the evidence is exhibited to us in the record before us, we are of opinion that the case is bailable, and the record shows that applicant can give bail in the sum of $2,500. Amount of his bail is fixed at that sum, and upon his execution of a bond in said amount of $2,500, with good and sufficient sureties, conditioned as the law directs, the said sheriff of Johnson county will release appellant from restraint and custody for said alleged crime.

The judgment is reversed and bail is granted in $2,500.

*Ordered accordingly.*